**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JEFFREY SYDNEY and STEPHEN**
**CAPOUSIS,** *on behalf of themselves and*
*others similarly situated,*

       **Plaintiffs,**

   **v.**              **5:13-CV-286**
                    **(FJS/TWD)**

**TIME WARNER ENTERTAINMENT-**
**ADVANCE/NEWHOUSE PARTNERSHIP,**

       **Defendant.**
_____

| APPEARANCES | OF COUNSEL |
|---|---|
| **LEVINE & BLIT, PLLC** | **LEWIS G. SPICER, ESQ.** |
| 499 South Warren Street, Suite 500B | **JUSTIN S. CLARK, ESQ.** |
| Syracuse, New York 13202 | **MATHEW J. BLIT, ESQ.** |
|    -and - | |
| 350 Fifth Avenue | |
| Suite 3601 | |
| New York, New York 10118 | |
| Attorneys for Plaintiffs | |
| | |
| **KABAT, CHAPMAN & OZMER LLP** | **J. SCOTT CARR, ESQ.** |
| 171 17th Street, NW, Suite 1550 | |
| Atlanta, Georgia 30363 | |
| Attorneys for Defendant | |
| | |
| **WARGO & FRENCH LLP** | **PRIYA B. VIVIAN, ESQ.** |
| 999 Peachtree Street, NE | **RACHEL E. SANKEY, ESQ.** |
| 26th Floor | |
| Atlanta, Georgia 30309 | |
| Attorneys for Defendant | |

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Pending before the Court is Defendant's motion for summary judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See generally* Dkt. No. 68.  Plaintiffs oppose this motion. *See* Dkt. Nos. 71-75.

**II. BACKGROUND**

Defendant provides telecommunications services, including cable television, internet, and phone services to the public. *See* Dkt. No. 68-2 at ¶ 1.  In December 2010, Defendant hired Plaintiff Jeffrey Sydney and Plaintiff Steven Capousis to serve as Territory Sales Representatives ("TSR"). *See id.* at ¶¶ 18, 19.  TSRs were responsible for identifying multiple dwelling unit buildings and forming relationships with the owners and managers of the complexes. *See id.* at ¶¶ 23, 26.  TSRs would introduce themselves to staff at the property to discuss services that were available to the tenants. *See id.* at ¶ 28.  Based on this relationship, TSRs would request that the staff tell new tenants to call the TSR to purchase Defendant's services. *See id.* at ¶ 29.  TSRs had to keep in constant communication with staff at the property and would meet with them either every week or every other week. *See id.* at ¶¶ 31, 32.  TSRs would hand out business cards and brochures that contained their contact information and information about Defendant's services. *See id.* at ¶¶ 34, 35.  Property staff would often include brochures in a new tenant's welcome package or leave brochures in the building's common areas. *See id.* at ¶¶ 40, 41.

An additional way TSRs promoted themselves was to hold events at various properties. *See id.* at ¶ 43.  TSRs would create flyers and work with property staff to promote the event. *See*

*id.* at ¶ 44.  These events were held to make tenants aware of Defendant's services as well as the expedited service that the TSRs could provide.  *See id.* at ¶ 45.

After obtaining the TSR's contact information -- either via property staff or through property events -- tenants would call the TSR directly to set up service.  *See id.* at ¶ 48.  TSRs would try to get customers to sign up for as many services as possible and could process the order over the phone.  *See id.* at ¶¶ 50, 51.  TSRs could then provide self-installation kits, schedule a technician to complete the installation, or schedule a time when the TSR could install the customer's services themselves.  *See id.* at ¶¶ 53, 54, 55, 57, 59.

Plaintiffs allege that they worked between 50-70 hours per week.  *See id.* at ¶¶ 61, 64.  The majority of Plaintiffs' time was spent in the field, although they often spent the mornings in the office.  *See id.* at ¶¶ 62, 63, 65, 68, 69.

TSRs received formal and informal sales training.  *See id.* at ¶ 72.  TSRs also attended weekly sales meetings to discuss sales tips.  *See id.* at ¶ 75.  TSRs were expected to reach minimum performance requirements that included maintaining "49 Primary Service Unit ("PSU")[1] sales in a fiscal month."  *See id.* at ¶¶ 78, 79.  Plaintiffs both achieved satisfactory performance reviews; however, they were each encouraged to knock on more doors within the complex to improve their overall sales volume.  *See id.* at ¶¶ at 82, 83.  Plaintiffs also received weekly rankings based on their sales against other Direct Sales Representatives ("DSR") and TSRs in the area.  *See id.* at ¶ 84.  DSRs worked in the same regions and were expected to sell Defendant's services door-to-door.  *See* Dkt. No. 71 at ¶ 201.

TSRs were paid an annual salary of $15,600 on a bi-weekly basis.  *See id.* at ¶ 96.  TSRs were additionally paid commission based on the Territory Sales Representative Commission

---

[1] The primary PSUs include the following: cable, phone, and internet. *See* Dkt. No. 68-2 at ¶ 13.

Plan ("Commission Plan").  *See id.* at ¶ 88.  The plan's purpose was to incentivize TSRs to achieve sales objectives.  *See id.* at ¶ at 89.  TSRs received commission based on the "(1) number of PSUs sold; (2) monthly recurring revenue ("MRR") generated by those PSUs; and (3) the number of bundle sales."  *See id.* at ¶ 91.

Occasionally, TSRs disputed the commission amounts that were paid.  *See id.* at ¶ 112. Defendant implemented a dispute process system to consider the potential discrepancies.  *See id.* at ¶ 113.  Both Plaintiffs utilized the dispute process.  *See id.* at ¶¶ 124, 127.

Defendant terminated Plaintiff Sydney's employment on August 29, 2012.  *See id.* at ¶ 145.  Plaintiff Sydney admitted to Human Resources that he had violated Defendant's cash handling policy on August 24, 2012, because he failed to turn in customer payments within the prescribed timeframe.  *See id.* at ¶¶ 136, 143.  Defendant terminated Plaintiff Capousis's employment on April 9, 2013.  *See id.* ¶ at 158.  In late February 2013, Defendant "received a complaint that Plaintiff Capousis had written down a customer's social security number and given it to another customer."  *See id.* at ¶ 150.  The Human Resources Department and a Sales Manager investigated the matter and held a meeting with Plaintiff Capousis at which he denied the accusation but admitted that he routinely wrote down customers' social security numbers. *See id.* at ¶¶ 151-53.  At that meeting, Plaintiff Capousis produced his work notebook that had several other customers' personal information inside that was weeks old.  *See id.* at ¶¶ 154-56.

Based on these allegations, Plaintiffs bring a collective action to remedy unpaid overtime compensation in violation of the Fair Labor Standards Act of 1938, as amended. ("FLSA").  *See* Dkt. No. 47 at ¶ 1.  Plaintiffs also bring a class action for violations of the New York Labor Law ("NYLL") "as a result of unpaid overtime, unpaid commissions, and breach of contract stemming from [Defendant's] non-payment of commissions."  *See id.*  Finally, Plaintiffs bring individual

claims against Defendant for retaliating against them due to their opposition to unfair labor practices. *See id.*

## III. DISCUSSION

### A.    Standard of review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials "demonstrate the absence of genuine issues of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the movant meets this burden, the nonmoving party must """set forth specific facts showing a genuine issue for trial.'"  *Id.* (quotation omitted).  "[I]n ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]"  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).  However, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing [*Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (*per curiam*)]).

**B.      Overtime claims under the FLSA and NYLL**

Subject to certain exemptions, the FLSA and the NYLL require employers to pay overtime to employees who work more than 40 hours in a workweek.  *See* 29 U.S.C. § 207(a)(1); 12 N.Y. C.R.R. § 142-2.2 (stating that "[a]n employer shall pay an employee for overtime . . . in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 *et seq.*, the Fair Labor Standards Act of 1938, as amended, . . .").  There are two exemptions relevant to the current litigation.  First, the FLSA exempts "any employee employed . . . in the capacity of outside salesman[.]"  29 U.S.C. § 213(a)(1).  Second, an employee of a retail or service establishment is similarly exempt.  *See* 29 U.S.C. § 207(i).

"The exemption question" under the FLSA "is a mixed question of law and fact."  *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (citation omitted).  "The question of how the [employees] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law. . . ."  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

As the Second Circuit stated in *Martin v. Malcolm Pirnie, Inc*., 949 F.2d 611 (2d Cir. 1991), however, "because the FLSA is a remedial act, its exemptions, such as the '[outside sales or retail]' exemption claimed in this case, are to be narrowly construed."  *Id.* at 614 (citations omitted).  "To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."  *A.H. Phillips, Inc., v. Walling*, 324 U.S. 490, 493 (1945).  Accordingly, "an employer bears the burden of proving that its employees fall within an exempted category of the Act."  *Martin*, 949 F.2d at 614 (citations omitted).

As noted, the FLSA overtime requirements do not apply to an outside salesperson, defined as an employee

> (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a)(1)-(2).

According to the regulations, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).  The FLSA defines the word "sale" to "include[] any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).[2]  The parties' main dispute in this case is whether Plaintiffs' primary duty was making sales or installing services.

Courts have articulated numerous factors relevant to an employee's status as an outside salesperson, "including (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Chenensky v. N.Y. Life Ins. Co.*, No. 07 CIV. 11504, 2009 WL 4975237, *5 (S.D.N.Y. Dec. 22, 2009) (citations omitted).  Courts also consider the relative importance of an employee's exempt duties relative to his other duties, *see* 29 C.F.R. § 541.700(a), as well as "whether the employee's compensation is based wholly or significantly on commission[,]" *Schmidt v. Eagle Waste & Recycling, Inc.*, 598

---

[2] The Supreme Court interpreted "other disposition" to "include[e] those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, __, 132 S. Ct. 2156, 2171–72 (2012).

F. Supp. 2d 928, 935 (W.D. Wis. 2009), *aff'd*, 599 F.3d 626 (7th Cir. 2010) (citations omitted); s*ee also Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1266 (10th Cir. 1999) (noting that courts recognize an important "distinction between employees who consummate sales at out-of-the-office locations and those employees who do not consummate sales there").

Plaintiffs' job title was Territory "Sales" Representative and was within Defendant's Direct "Sales" Department.  *See* Dkt. No 68-2 ¶¶ 9-10.  Although Plaintiffs received a bi-weekly salary of $600.00, the majority of their salary came from commissions.  *See* Dkt. No. 68-1 at 7.  Plaintiffs received commissions for all completed sales.  *See* Dkt. No 68-2 ¶¶ 91, 94.  Commissions were based on the (1) number of PSUs sold; (2) monthly recurring revenue generated by those PSUs; (3) the number of bundle sales; and (4) performing installations.  *See id.* at ¶ 91; *see also* Dkt. No 68-4 Hirsch Aff. at ¶ 6; Dkt. No 80-2 "Exhibit A" (showing breakdown of how commissions are paid).  Plaintiffs did not have to perform the installation to receive commission for the sale.  *See* Dkt. No. 68-6 at TWC000306-12.[3]

Plaintiffs' duties involved seeking out and building relationships with property managers and leasing agents at apartment complexes throughout Onondaga County.  *See* Dkt. No. 68-2 at ¶ 26.  Plaintiffs formed and initiated these relationships to describe Defendant's products so that, in turn, new tenants would contact Plaintiffs directly to sign up for service.  *See id.* at ¶¶ 28-29.  Plaintiffs attempted to meet with the property managers at least once a week or every other week.  *See id.* at ¶ 32.  Plaintiffs also promoted themselves at events in the complexes where they

---

[3] Plaintiffs make the conclusory statement that they were not paid for services they did not install.  However, Plaintiffs do not refer to any facts that support this claim, and their contention is directly contradicted by affidavits and exhibits showing that Plaintiffs received Monthly Recurring Revenue credit for services they procured but either had a technician install or sent the customer a self-install kit.  *See* Dkt. No. 68-2 at ¶ 91; *see also* Dkt. No 68-4 Hirsch Aff. at ¶ 6; Dkt. No 80-2 "Exhibit A" (showing breakdown of how commissions are paid).

could directly sign people up for service.  *See id.* at ¶ 43.  Thus, Plaintiffs received orders through referrals or through these events.  *See id*. at ¶ 47.  Importantly, "[w]ithout a positive relationship with the leasing agents or property managers, Plaintiffs were less likely to obtain work orders from their assigned complexes."  *See* Dkt. No. 72 at 5.

To help reach their goals, Plaintiffs attended sales trainings, tracked their statistics against other TSRs, and had yearly performance reviews that included tips to increase their sales numbers.  *See* Dkt. No. 68-2 at ¶¶ 78-87.  The majority of Plaintiffs' time was spent out of the office meeting with apartment staff, taking work orders, and installing services.  *See id.* at ¶¶ 62-63, 65-71.  Plaintiffs claim to have worked anywhere between 50-70 hours a week.  *See id.* at ¶¶ 61, 64

Plaintiffs also installed services and addressed minor technical issues for existing customers.  *See* Dkt. No. 72 at 3.  Plaintiffs contend that "one significant way that [they] maintained a positive relationship with property managers was by troubleshooting tenants' issues with [Defendant's] services."  *See id*. at 5.  Furthermore, customers placed orders directly with TSRs because it was more convenient, e.g., TSRs could offer same-day installation.  *See* Dkt. No. 68-2 at ¶¶ 58-59.

Based on these undisputed facts, the Court finds that Plaintiffs' primary duty was making sales.  Although Plaintiffs contend that they never went door-to-door to make sales, the entirety of their job was focused on acquiring new customers.  Plaintiffs admit that performing installations and troubleshooting helped them maintain better relationships with the property managers and customers, thereby helping them obtain additional work orders and consequently more commissions.  *See Schmidt*, 598 F. Supp. 2d at 936 (noting that engaging in activities related to resolving issues and retaining customers directly affected the commissions received).

For example, TSRs could work to build relationships with property managers while never installing any services (because they provided self-install kits or scheduled a technician), but still obtain monthly recurring revenue commissions; however, if TSRs only performed installations, and never worked with property managers to obtain referrals, they would have no work orders and thus no commissions. *See, e.g., Chenensky*, 2009 WL 4975237, at *6 (noting that "[Plaintiff] would not have received *any* wages from [Defendant] had he only advised clients or maintained good relationships with customers").

Moreover, as the court in *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747 (W.D. Mich. 2003), explained, "the consummation of sales requires a measure of the capacity of two parties." *Id*. at 760. In other words, the buyers (tenants in this case) "must have the capacity to purchase or place an order for a product or service"; and the seller (Plaintiffs in this case) "must have the capacity to consummate sales, take orders, or obtain commitments from the buyer for the purchase of the employer's services." *Id*. Given the above-stated facts, Plaintiffs clearly "consummated sales [and] directed their efforts toward the consummation of sales[.]" *Id*.

Altogether, the TSR's job constituted a revolving cycle of initiating the sale, obtaining a work order, scheduling the installation, and oftentimes performing the installation -- all in pursuit of obtaining as many customers and commissions as possible. *See Schmidt*, 598 F. Supp. 2d at 936 (noting that the "plaintiff engaged in a number of activities only indirectly related to sales, but benefitting her sales activities . . . [such as] develop[ing] plans and materials to attract new customers[,] . . . attend[ing] local Chambers of Commerce meetings and social functions to promote sales . . . [and] engag[ing] in activities related to resolving account and service disputes in order to retain her customers. . . . All of these activities directly affected the commission payments she received.")

Thus, this case is distinguishable from those situations in which the courts have concluded that the outside salesperson exemption did not apply. *See, e.g., Campanelli v. Hershey Co.*, 765 F. Supp. 2d 1185, 1190 (N.D. Cal. 2011) (finding that the outside salesperson exemption did not apply where the plaintiff-employees almost never made direct sales but rather promoted a product while other representatives of the employer actually took the orders and made the sales); *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 282 (6th Cir. 1970) (finding the outside salesperson exemption inapplicable when the plaintiffs only delivered a product but did not make the initial sale). Unlike these cases, Plaintiffs fostered their relationship with apartment staff and took direct orders from customers. In essence, each installation marked the final consummation of a sale. Therefore, considering the TSR job as a whole, the Court finds that Plaintiffs' primary duty was to obtain sales.

Furthermore, the undisputed facts establish that Plaintiffs were "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a)(2). In fact, Plaintiffs admit that they spent the majority of their time outside of the office, thereby satisfying this element of the outside salesperson test. *See* Dkt. No.68-2 at ¶¶ 62-63, 65-71.

Accordingly, for the above-stated reasons, the Court concludes that Plaintiffs have not raised an issue of material fact with regard to their duties and that, as a matter of law, the outside salesperson exemption applies to Plaintiffs. Therefore, the Court grants Defendant's motion for summary judgment as to Plaintiffs' FLSA and NYLL overtime claims.[4]

---

[4] Since the Court has determined that the outside salesperson exemption applies to Plaintiffs, it does not need to address Defendant's alternative argument that the retail or service establishment exemption also applies to this case.

- 11 -

**C.   Unpaid sales commissions claims**

*1. Labor Law § 191-b*

New York Labor Law § 191–b allows an aggrieved party to bring an action against another party that has "breached its duty to pay commissions earned under the parties' oral and written agreements." *AHA Sales, Inc. v. Creative Bath Prods., Inc.*, 58 A.D.3d 6, 17 (2d Dep't 2008) (footnote omitted).  "New York Labor Law § 191-b protects 'sales representatives' in their dealings with their principals, and sets out the requirements for payment of commissions." *Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360, 369 (S.D.N.Y. 2006).  The statute "defines '[s]ales representatives' as *independent contractor*s, in contrast to 'commission' salespersons, who are classified as employees[.]"  *AHA Sales*, 58 A.D.3d at 15 (emphasis added) (citing N.Y. Lab. Law § 191-a[d]).

The undisputed facts show that Plaintiffs are not independent contractors.  *See* Dkt. No. 68-2 at ¶¶ 4, 6.  Therefore, the Court finds that Plaintiffs' claims fail as a matter of law and thereby grants Defendant's motion for summary judgment as to Plaintiffs' § 191-b claim.  *See Derven*, 427 F. Supp. 2d at 370.

*2. Labor Law § 191(1)(c)*

New York Labor Law § 191(1)(c) provides, in relevant part, that "[a] commission salesperson shall be paid the wages . . ., commissions and all other monies earned or payable in accordance with the agreed terms of employment[.]"  N.Y. Lab. Law § 191(1)(c).  "It is beyond dispute that the phrase 'in accordance with the agreed terms of employment' means that the parties to an employment agreement may define for themselves the circumstances under which wages [or commissions] are 'earned.'"  *Giugliano v. FS2 Capital Partners, LLC*, No. 14-cv-7240,

2015 WL 5124796, *15 (E.D.N.Y. Sept. 1, 2015) (citations omitted); *see also Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 618 (2008) (stating that, "in the absence of a governing written instrument, when a commission is 'earned' and becomes a 'wage' for purposes of Labor Law article 6 is regulated by the parties' express or implied agreement").

In this case, the TSR Commission Plan governs whether Plaintiffs have received the commissions that Defendant owed to them. The TSR Commission Plan states that "[a]ll discrepancies must be submitted no later than the 5th day of the month for the previous fiscal month. . . . Discrepancies not submitted within the defined period are not eligible for commission." *See* Dkt. No. 68-6 at 92 (TWC000308). Thus, the TSR Commission Plan has a prerequisite for obtaining any commissions that TSRs believe they were owed but did not receive, namely, filing a discrepancy within five days after the end of the month. *See id.*

To support his claim, Plaintiff Sydney states, "I believe I am still owed approximately $5,000 in commissions." *See* Dkt. No. 74, Aff. of Jeffrey Sydney, at ¶ 45. To support his claim, Plaintiff Capousis states, "Throughout 2012 and into 2013, I was not receiving my earned commissions." *See* Dkt. No. 75, Aff. of Stephen Capousis, at ¶ 41. He further states that, after making complaints, "I was told that [Defendant] was investigating the matter. An investigation was done and it was determined that I was owed over $1,000 and I still have not been paid this money." *See id.* at ¶ 42.

Plaintiffs fail to specify any particular transaction for which Defendant owed them commission. Most importantly, from a contract perspective, Plaintiffs' statements fail to mention whether they complied with the TSR Commission Plan by filing a discrepancy in the month following the month in which they believed Defendant owed them a commission. *See Giugliano*, 2015 WL 5124796, at *15. Although Defendant Capousis makes some allegations of

- 13 -

commissions owed, his vague conclusions fail to specify dates, amounts, and whether he first filed a discrepancy.  Therefore, because Plaintiffs have failed to create a genuine issue of material fact, the Court grants Defendant's motion for summary judgment with regard to Plaintiffs' § 191(1)(c) claim.


**D.     Retaliation claims**

Plaintiffs raise two unlawful retaliation causes of action, one under the FLSA, 29 U.S.C. § 215(a)(3), and the other under New York Labor Law, N.Y. Lab. Law § 215(1)(a).  *See* Dkt. No. 47 at ¶¶ 73-82.  The FLSA provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).  Similarly, NYLL provides that "[n]o employer …, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer[.]"  N.Y. Lab. Law § 215(1)(a).


*1. FLSA*

To establish a prima facie case of retaliation, "a plaintiff must show '(1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008) (quotation omitted).  "The plaintiff's burden at the beginning of the case is a light one, usually demanding

only that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) (citation omitted).

The FLSA "prohibits retaliation against employees who orally complain to their employers, so long as their complaint is 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015) (quoting *Kasten [v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14], 131 S. Ct. at 1335 [(2011)]).[5]  Plaintiffs assert that they made frequent complaints about pay, including unpaid commissions and overtime.  *See* Dkt. No 71 at ¶¶ 200, 216, 217.  Specifically, Plaintiff Sydney stated in his deposition that he "made complaints that we weren't being compensated for amount of time and work that we were putting in -- for installation."  *See* Dkt. No 73-1 at 115 (page 126 of deposition).  Plaintiff Sydney stated that he made those complaints to his supervisor, William Edwards.  *See id.*  Plaintiff Capousis stated that he made complaints "two or three times" to his supervisor Matt LeClair and William Edwards about not being paid enough money and not being paid overtime.  *See id.* at 139-141.  In sum, Plaintiffs only assert that they made oral complaints to several supervisors about not being paid enough.

To qualify as a protected activity, oral complaints must be "made to employers in a context that makes the assertion of rights plain." *Greathouse*, 784 F.3d at 115.  The court in *Greathouse* made it clear that a complaint must include "'*some* degree of formality.'"  *Id*. at 116 (quotation omitted).  The complaint must be formal enough, "'where the recipient has been given

---

[5] Defendant initially argued that only a complaint to a government official constituted a "protected activity."  *See* Dkt. No. 68-1 at 22-23.  The case law on which Defendant relied has been overruled, thus this argument is no longer valid.  *See Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015) (overruling *Lambert v. Genesee Hospital*, 10 F.3d 46 (2d Cir. 1993)).

fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns[.]'" *Id.* (quotation omitted) (stating, "[i]t seems to us inconsistent with *Kasten* to elevate a grumble in the hallway about an employer's payroll practice to a complaint 'filed' with the employer within the meaning of section 215(a)(3)").  Therefore, "'a complaint is "filed" [only] when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act.'"  *Id.* (quoting [*Kasten*, 131 S. Ct.] at 1335).

In this case, the alleged complaints are ill-documented and unclear.  Plaintiffs' deposition testimony only makes cursory reference to complaining about overtime.  The main thrust of their complaints appears to center on being underpaid.  *See* Dkt. No. 73-1 at 115 (Q. Did you specifically say you should be paid overtime? A. I said we should be paid more money for the amount of work that we're doing").  In essence, Plaintiffs' complaints were that they should be paid in the same manner as service technicians.  *See* Dkt. No. 73-1 at 115 ("I believe we talked about overtime. If we were going to be doing that, since we were being -- since we were technically technicians, technicians are paid overtime and we should be paid the same."); 140 (Plaintiff Capousis stating he was fired for being "[n]ot happy about not getting paid and the pay scale we were on.").

These complaints do not provide any specificity as to the illegality of Defendant's actions and, at best, only put Defendant on notice that Plaintiffs believed that they had not been paid what was promised.  However, complaints about unpaid commissions and about Defendant's pay structure do not assert a colorable violation of the FLSA and are thus not protected activity. "That is because, under settled law, the FLSA neither converts an employer's contract breach into a violation of federal law, nor generally federalizes disputes between employers and employees."

*Dunn v. Sederakis*, 143 F. Supp. 3d 102, 110–11 (S.D.N.Y. 2015) (citing *Nakahata v. New York– Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) ("The FLSA statute requires payment of minimum wages and overtime wages only . . .")) (other citations omitted). Although Plaintiffs need not complain that Defendant acted illegally, their complaints must be a "clear articulation of facts indicative of illegality[.]" *Dunn*, 143 F. Supp. 3d at 113.  At best, Plaintiffs' generalized oral references to "overtime" might reasonably suggest to Defendant that they were asserting a breach of internal policy or contractual duty. *See id.*  "At the very least, there would be no basis for the listener to infer that [Plaintiffs'] opaque and unexplicated reference to 'overtime' was meant to claim a violation of the FLSA." *Id.*; *see also Mohamed v. NYU*, No. 14cv8373, 2015 WL 3387218, *26 n.24 (S.D.N.Y. May 21, 2015) (stating, "[m]erely using the word 'overtime' in a complaint otherwise devoid of related facts does not state an FLSA claim").

Therefore, because Plaintiffs failed to allege facts from which a reasonable jury could find that they engaged in a protected activity, the Court grants Defendant's motion for summary judgment with respect to Plaintiffs' FLSA retaliation claims.

### 2. New York Labor Law

"In order to establish a prima facie case under New York Labor Law Section 215, the plaintiff must adequately plead that while employed by the defendant, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action." *Higueros v. New York State Catholic Health Plan, Inc.*, 630 F. Supp. 2d 265, 269 (E.D.N.Y. 2009) (citations omitted). "'Once a prima facie case of retaliation is established, the burden of production shifts to the

employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.'" *Id*. at 271 (quoting *Raniola*, 243 F.3d at 625) (other citation omitted).  If the defendant has made such a showing, the plaintiff can counter the defendant's alleged legitimate, nondiscriminatory reason with evidence that the explanation is pretextual.  *See id*. at 272.

Like the FLSA, a plaintiff "must show that [he] 'complained about a specific violation of the Labor Law.'"  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quotation omitted).  "An employee need not cite a specific statute, . . . but her 'complaint to the employer [must] be of a colorable violation of the statute . . . .'"  *Id*. at 473 (internal quotation and other citations omitted).  As recounted above, Plaintiffs complained about how Defendant administered its commission plan.  New York law requires an employer to pay employees in accordance with agreed upon contracts, such as the commission plan.  *See* N.Y. Lab. Law § 191(1)(c) (providing that "[a] commission salesperson shall be paid wages . . ., commissions and all other monies earned or payable in accordance with the agreed terms of employment").  Thus, as an initial matter, the Court finds that, unlike with their FLSA claims, Plaintiffs have adequately shown that they engaged in protected activity with respect to their NYLL claims.

Furthermore, "'[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'"  *Lopez v. Advantage Plumbing & Mech. Corp*, No. 15-CV-4507, 2016 WL 1268274, *3 (S.D.N.Y. Mar. 31, 2016) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996))).  With respect to Plaintiff Sydney, he was terminated on August 29, 2012, and alleges that he last complained as late as earlier that same month.  *See* Dkt. No. 74 at ¶¶ 41, 43.  With respect to Plaintiff Capousis, he was terminated on April 9, 2013, and alleges that he complained in February and

- 18 -

March 2013.  *See* Dkt. No. 75 at ¶¶ 42-44.  Therefore, the Court finds that Plaintiffs have made out a prima facie case of retaliation in violation of NYLL.

In response, Defendant has presented sufficient evidence that it had legitimate, non-discriminatory reasons for terminating both Plaintiffs.  In this regard, Defendant has presented evidence that it terminated Plaintiff Sydney because, on August 23, 2012, a customer complained that a $70.00 cash payment he had given to Plaintiff Sydney was not applied to his account. *See* Dkt. No. 68-2 at ¶ 139.  Furthermore, Defendant has presented evidence that it terminated Defendant Capousis because he routinely wrote down the names, addresses, and social security numbers of customers in a notebook, which violated company policy.  *See id.* at ¶¶ 147-156.

The burden thus shifts back to Plaintiffs to support a finding that Defendant's proffered reason is a pretext for discrimination.  Plaintiff Sydney makes the conclusory and unsupported claim that he was terminated because of his complaints and that he had previously mishandled cash but was not punished.  *See* Dkt. No. 74 at ¶ 44; Dkt No. 71 at ¶ 137.  However, the record evidence Plaintiff uses to support his claim is inconclusive, self-serving, and does not create a genuine issue of material fact as to whether he was terminated for violating the cash handling policy.  Plaintiff Capousis' allegations of pretext are sparser.  He merely alleges that it was common practice to write down sensitive customer identification but he fails to support his allegation with anything beyond his own testimony.  Therefore, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact as to whether they were terminated in retaliation for complaining about the TSR commission plan.  Accordingly, the Court grants Defendant's motion for summary judgment with regard to Plaintiff's NYLL retaliation claims.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 68, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: March 28, 2017
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge